Maxwell, &c. vs. Maxwell.

CASE 27————JUNE 28.

## Maxwell, &c., vs. Maxwell.

APPEAL FROM NELSON CIRCUIT COURT.

A will or codicil may be entirely depending on a contingency, so as to have no effect as an instrument of a will unless that event happened. (1 *Vesey, Sr.*, 190.)

In January, 1857, M., of Nelson county, Ky., escaped from the wreck of a steamer on the Mississippi river, and arriving in Memphis, Tenn., wrote to his wife a letter in which, after an account of the hardships and dangers through which he had just passed, he says: "The ice is still running very bad in the river. I can't say when I will be able to get off from here, but I suppose soon, as the weather seems to be moderating. The river is very low and navigation very dangerous—so much so, I feel that I should protect you in any emergency. I would not have had you with me for the world. If I never get back home, I leave you everything I have in the world. The property I got by my first wife I wish you to return everything to her father." The letter and signature were wholly in his handwriting. It was received by his wife. He subsequently returned home and lived until March, 1858, when he was murdered near his residence by his slaves. *Held*—that the instrument was a contingent will, and as the condition upon which it was to take effect did not happen, it cannot be established as a last will and testament.

In the case, *supra*, there was parol evidence of parol declarations of the author of the letter, (in the absence of the paper which was never seen by the witnesses,) made upon divers occasions after he had returned to his home, that he had written such a

Maxwell, &c. vs. Maxwell.

paper, giving the time and place it was written, and the circumstances under which it was written, and giving also the substantial provisions of the paper, coupled with a declaration that he still had the paper, that it was his will, and that he intended his property to go at his death as therein directed. *Held* not sufficient to give effect to the instrument as a will.

A will cannot be revoked in this State except by some one or more of the modes mentioned in *sections 9 and 10 of the chapter on Wills in the Revised Statutes.*

A re-execution of a revoked will can only be effected by such acts of the maker as are equivalent to an original execution. Parol acts or declarations are not sufficient for the purpose.

JAMES HARLAN, for appellants, cited 1 *Williams on Executors, pages* 153, 176, 178; 6 *Vesey, Jr.*, 608; 2 *Watts & Serg.*, 145; 1 *Harris & Johnson*, 346; 22*d section of Act of Parliament, passed 3d July*, 1837 ; *Virginia Code of* 1849, *page* 517 ; *Rev. Statutes Ky., page* 695, *section* 11 ; 1 *Lomax on Executors, page* 160 ; 14 *Grattan*, 332.

SHUCK, on same side, cited 2 *Stat. Law*, 1537; *Rev. Statutes,* 694–5, *secs.* 9, 10 *and* 11; *Ib.*, 694, *sec.* 7; *Ib.*, 697, *sec.* 26 ; *Hardin*, 119 ; 1 *Williams on Executors, pages* 167 *to* 177.

C. S. HILL, for appellee, cited 1 *Williams on Executors, pages* 153–4–5, *and cases cited*; *Rev. Stat.*, (*Wills,*) *secs.* 9, 10, 11 ; 1 *Williams on Executors, page* 169, *note* 1 ; *Ib.*, 170, 175, 89, 295 ; *Massie's Will*, 2 *Met.*, 364.

W. R. GRIGSBY, on same side, cited *Rev. Stat.*, (*Wills,*) *sec.* 5 ; *Massie vs. Griffin*, 2 *Met.*, 364 ; 1 *Williams on Executors*, 169.

JUDGE WOOD DELIVERED THE OPINION OF THE COURT:

The steamer Niagara was wrecked upon the Mississippi river, near Island 34, in the month of January, 1857. Upon that occasion James G. Maxwell, a citizen of Kentucky, and a resident of the county of Nelson, was a passenger. In consequence of the misfortunes of the boat, her passengers and crew were subjected to intense suffering, and their lives placed in imminent peril. In this suffering and peril Maxwell shared in common with his fellow passengers. He escaped, however, and not long after arrived in the city of Memphis, Tennessee.

Upon his arrival he wrote to his wife a letter of considerable length, appropriate to the occasion, in which he gave a detailed and somewhat graphic account of the hardships and dangers through which he had just passed. After he had

Maxwell, &c. vs. Maxwell.

finished this account, near the end of the letter, the writer inserted the following words :

"The ice is still running very bad in the river. I can't say when I will be able to get off from here, but I hope soon, as the weather seems to be moderating. The river is very low and navigation is very dangerous—so much so, I feel that I should protect you in any emergency. I would not have had you with me for the world. If I never get back home, I leave you everything I have in the world. The property I got by my first wife I wish you to return everything to her father."

It may be assumed that this letter was sent to, and received by, the person to whom it was addressed. It bears date 25th January, 1857.

Subsequently, Maxwell returned to his home in Kentucky, or, to use the language employed by himself, he got back home.

He lived until March, 1858, when he was murdered, near his residence, by certain of his own slaves.

The record shows that, at a special term of the Nelson county court, held on the 20th day of September, 1858, the letter aforesaid, from which we have made an extract, was produced in court by Susan M. Maxwell, and offered for probate and record, as the last will and testament of James G. Maxwell, deceased.

The county court refused to admit the paper offered to probate as the true last will of said Maxwell, deceased, but rejected it, for the reason, as stated in the order, that the evidence was not sufficient to establish it.

From this decision of the county court an appeal was taken to the circuit court for said county.

In the circuit court a jury was empanneled to try the issue as to whether the said paper was, or not, the true last will of James G. Maxwell—that being contested by the mother and brothers and sisters of the decedent, who were his next of kin. Upon the issue thus formed the jury found that the paper propounded was in fact the last will and testament of said decedent. Thereupon the court rendered a judgment reversing the order of the county court, by which the paper had been rejected, and directing that it should be admitted to record.

Maxwell, &c. vs. Maxwell.

To reverse the judgment of the circuit court this appeal is prosecuted by the contestants.

It thus becomes the duty of this court to try the law of the case and the facts, as they have been certified to us from the circuit court, and to determine whether or not the paper which has been propounded as the will of James G. Maxwell is, in fact, his true last will and testament, and whether it should, or not, be admitted to probate.

Obviously the first duty of the court is to ascertain the real nature of the writing which is offered as the will. Is it an absolute and unconditional disposition of the estate of the writer, or is it what is commonly denominated a *contingent will;* or, to speak with more exact propriety, is it such a writing as may or may not eventually take place as a will, dependent upon the happening or not happening of a certain event?

The question is, did Maxwell, when he wrote the letter to his wife, intend to, and did he actually make and publish that as his will at all events; or did he make the fact of its becoming his will depend upon the event of his getting back home?

In the case of *Parsons vs. Lanoe*, (1 *Vesey, Sr.*, 190,) the Lord Chancellor (Hardwicke) said, "I am very clear, without the help of an authority, that a will or codicil may be entirely depending on a contingency, so as to have no effect, as a instrument of a will, unless that event happened." In that case Colonel Charles Lanoe, intending to go to Ireland, made a. paper writing in 1732, declaring it to be his last will in manner following: "If I die before my return from my journey to Ireland, that my house and land at Farley Hill, and all the appurtenances and furniture thereto belonging, be sold as soon as possible after my death, and thereout all my debts and funeral charges be paid. Item, £1000 to A, out of the said money arising from said sale, and £100 to B, and after all debts, legacies, and funeral expenses discharged, all the residue of the money arising from the aforesaid sale, and all real and personal estate, interest in houses, and all other estate, to my wife and her heirs forever."

"He had then no children; and soon after pursued his intended journey to Ireland, where he continued some time;

and after his return to England had two children, a son and a daughter, and lived till 1738.

"He kept this will by him, nor did it appear that he made any other; but there was evidence of his speaking to his friends of a will, showing he did not intend to die intestate, of which he expressed some detestation." These facts we learn from the statement of the reporter at the head of the case. And, upon these facts, the chancellor was of opinion that this "was merely a contingent provisional disposition, and consequently no part thereof was intended to take effect but in the event of his dying before his return, in which view it was made."

In the case of *Sinclair vs. Hone,* (6 *Vesey, Jr.*,) the question was as to the nature of a codicil in these words, viz: "In case I die before I join my beloved wife, Augusta Sinclair, I leave to her all of my property, £500 to my brother Duncan excepted, to be paid to him when my beloved wife can spare it." Signed by the testator and witnessed.

A voyage which he then had in contemplation being prevented by accident, the testator joined his wife, in the island of Dominica, where they lived together for some time, and then went to England. He afterwards went to Corsica, thence to Lisbon, and there died. It was held that the codicil was contingent, and that it never took effect, inasmuch as he joined his wife, the Master of the Rolls entertaining the opinion that the voyage to Corsica was not in the mind of the testator when the codicil was made.

In the case of *Todd's will,* where a person having in view a journey, thus begins an informal testamentary paper: "My wish, desire, and intention now is that if I should not return, (which I will, no preventing Providence,) what I own shall be divided as follows, etc., etc."—it was held by the supreme court of Pennsylvania that upon his return and subsequent death, the instrument ought not to be admitted to probate." (2 *Watts & Sergeant,* 145.)

In other cases where words like these, "In case I should die on my travels," or "lest I die before the next sun, I make, &c.," were used, the dispositions were not regarded as con-

tingent, where careful preservation and subsequent recognition of the papers as wills were proved.

These cases serve, to some extent, to show how other courts have construed writings similar to this.

The question recurs, what is the true nature, and what the proper construction, of the paper now before the court? The words of testamentary disposition are, "if I never get back home, I leave you every thing I have in the world." Considering the words alone it seems to us that they are words of as positive and express condition as can be. It is not perceived how a condition could be more plainly expressed.

The condition is quite as strongly expressed here as in the words used in the case of Lanoe's will, or Sinclair's, or Todd's will.

Our construction is fortified by an examination of the context, as well as by a consideration of the circumstances under which Maxwell's letter was written. He had just barely escaped with his life from a condition of intense suffering and imminent peril, as we learn from the account which forms the staple of his letter to his wife. A large part of his journey was still before him. He expected soon to be again upon the Mississippi river, although he did not know when he would be able to leave Memphis. The ice was running badly. The river was very low, and navigation very dangerous—so much so that he felt he should protect his wife in any emergency. To what emergency or emergencies did he refer? What dangers were then in his contemplation? Undoubtedly the emergencies and dangers which he regarded as incident to the journey in which he was then engaged. He did not, at the moment, look beyond that. He did not *then* think of emergencies or dangers through which he might be called to pass after that journey should be complete. The word *any*—the qualifying word of emergency—was not intended to include all the emergencies of life, but those emergencies only which might possibly arise before he should get back home. Evidently he thought if he returned to his home he could protect and provide for his wife as he should then think proper; but in the event

that he should not get back, then he chose to protect her in the manner provided for in the letter.

It seems to us that the conclusion is inevitable that Maxwell did not intend the writing before us to be his will, except in the event of his never getting back home. Whether it was eventually to take place as his will or not, was made by him, in his own words, to depend upon the happening, or not happening, of that particular event. Here was a contingency—a condition. The only question remaining is, did it happen? It did not. The result is that the paper never was the will of Maxwell.

The writing in this case is unlike that which was established as the will of Massie, in the case of *Massie vs. Griffin*, decided at the Summer Term, 1859, of this court. (2 *Met.*, 364.) In that case it was decided that the condition was limited to a single provision of the will, and was not applicable to the entire writing, and it was not therefore a contingent will. But here that portion of the writing, claimed to be a testamentary instrument, is made in such terms as to render it totally dependent on a contingency whether it shall *ever* become a will. The contingency applies to the entire disposition. The two cases are, therefore, not analogous.

The only question left now for our consideration is this: What effect is to be given to the parol declarations, which are proved to have been made by Maxwell, in reference to the writing now offered as a testamentary instrument subsequently to his return to his home in Kentucky?

The bill of exceptions shows that there was evidence upon the trial in the circuit court, by several witnesses, that Maxwell, after he had returned to his home, upon divers occasions, had spoken of his will, telling where it was written, (viz: at Memphis,) immediately after he escaped from the wreck of the Niagara; and what was in the will, (namely, that he had given everything he had to his wife, except what had been given him by Everhart, the father of his first wife, and that was to be returned to him.)

It was stated by some of the witnesses that he said he still had that will; that it was his will, and he intended to

keep it; and that his relations never should have any of his estate.

It is not to be doubted that these conversations, or statements, referred to the letter of the 25th January, 1857, written from Memphis to his wife, now propounded as his will.

It is well established that the letter and signature are wholly in the hand-writing of Maxwell.

Now, are these parol declarations, proved as they are altogether by parol evidence, sufficient to make an instrument a last will and testament, which otherwise never was and never could have been a will?

By *section* 11, *chapter* 106, *title* "*Wills*," *Revised Statutes*, it is enacted that, "no will or codicil, or any part thereof, which shall be in any manner revoked, shall, after being revoked, be revived, otherwise than by re-execution thereof, or by a codicil executed in the manner herein before required, and then only to the extent to which an intention to revive the same is shown."

It is necessary, in this connection, that the sections of the statute, which relate to the revocation of wills, be examined.

The *9th section* relates to what are usually termed implied revocations, and is in these words: "Every will made by a man or woman shall be revoked by his or her marriage, except a will made in the exercise of a power of appointment when the estate thereby appointed would not, in default of such appointment, pass to his or her heir, personal representative, or next of kin."

*Section* 10, of the statute, is as follows: "No will or codicil, or any part thereof, shall be revoked, unless under the preceding section, or by a subsequent will or codicil, or by some writing declaring an intention to revoke the same, and executed in the manner in which a will is required to be executed, or by the testator, or some person in his presence and by his direction, cutting, tearing, burning, obliterating, cancelling, or destroying the same, or the signature thereto, with the intent to revoke."

The *5th section* of the statute prescribes the mode in which a will shall be executed in order to make it valid.

By the express and positive terms of the statute, no will can be revoked in this State except in some one or more of the modes mentioned in sections nine and ten, *supra*.   It is manifest, therefore, that this is not a case of revocation but simply a case in which a writing, intended, at the time of its execution, to be a testamentary instrument in a certain event, never became such, because the event in which it was to become a will did not occur, but the opposite state of case did occur; whereby it was rendered impossible that the paper should become a will, by reason of the condition contained in it.

It may therefore well be doubted, whether or not that paper ever could be revived, by any kind of re-execution, so as to give *it* the validity and force of a will.   It would seem that an act which would give vitality and effect to the disposing part of the writing would be the making of a new will, which must be made and published in accordance with the requirements of the statute; in which case it would be the new instrument which would be probated, and not the one in which the testamentary disposition was originally contained.

If this be the correct view of the matter, the eleventh section of the statute, and the doctrine in reference to the re-execution of revoked wills, have no application to the case before us.

But if it were a clear case of revocation, we are satisfied that no such re-execution of the paper, as is required by the statute, has been proved.

It is not necessary, at this day and in this place, that we review the history of the legislation in regard to wills either in England or in the States of this Union.

By the 11*th section* of our statute of wills, adopted in 1852 as part of the Revised Statutes, *supra*, there is a mode—or to speak, perhaps, with more exact propriety, there are two modes—prescribed, in which a will or codicil, or any part thereof, which shall be in any manner revoked, shall, after being revoked, be revived, *first*, "by re-execution thereof," and *secondly*, "by a codicil executed in the manner herein before (i. e. in the statute,) required."

In this case it is not pretended that the will has been revived by a codicil. But the counsel for appellee insist that there has been a *re-execution* proved, sufficient for a revival.

It is clear that a re-execution can only be effected by such acts of the maker as are equivalent to an original execution. How is a valid will to be made or executed? We have the answer in the fifth section of the chapter on wills, as follows: "No will shall be valid unless it is in writing, with the name of the testator subscribed thereto by himself, or by some other person in his presence and by his direction; and moreover, if not wholly written by the testator, the subscription shall be made or the will acknowledged by him in the presence of at least two credible witnesses, who shall subscribe the will with their names in the presence of the testator."

Of course it is not insisted that there was a re-execution, by subscription or acknowledgment in the presence of two witnesses, who subscribed the will with their names in the presence of the testator. There is no proof tending to show such acts, and the case is not within that provision of the statute. But the counsel of appellee insist that no such acknowledgment or subscription was necessary, because the will was wholly written by the testator.

Suppose that reacknowledgment, or re-subscription, in the presence of two witnesses, who also subscribe in the presence of the testator, is not necessary, yet some act must be done equivalent to the original making or execution.

It was originally written and signed wholly by the supposed testator. Now what are the acts relied upon here as equivalent to the original execution? They are nothing more than the parol declarations of Maxwell that he had written such a paper as the one now before us, giving the time and place of the writing, and the circumstances under which it was written, and giving also the substantial provisions of the paper, coupled with a declaration that he still had the paper, that it was his will, and that he intended his property to go, at his death, as therein directed. This is certainly as strongly stated as the evidence makes the case for the appellee.

The writing was at no time present when Maxwell was conversing about it. Not one of the witnesses saw it during his life. When the paper is produced, it is seen that it is never to be a will except upon the happening of a contingency therein plainly expressed. The contingency is the peculiar and distinguishing feature of the paper. It is in writing. And now the effort is to change or destroy *that* by the *parol* declarations of Maxwell, proved by *parol* evidence. To allow this would be strikingly within all the mischiefs which we know the statute was intended to guard against.

We do not suppose it will be contended by any one that Maxwell, at any time, when speaking of this paper now said to be a will, intended to re-execute it; or believed that he was re-executing it. Certainly no act of his was done, or word said, with the intent or purpose, at the time, of re-executing the will. How then can it be said that he did re-execute it?

The 11th *section* of our statute of wills, *supra*, is in substance the same as the 9*th section*, *chapter* 122, of the new Wills Act of Virginia, which is nearly identical with the 22*nd sec. of ch.* 26, 1 *Victoria*, which took effect in England 1st January, 1838. (See English statute as published at the end of the 2*nd vol. of Jarman on Wills.*)

In *Lomax on Executors, vol.* 1, *p.* 160-1, the law under the new Wills Act of Virginia is thus laid down: "The only mode in which a will, which has been revoked, can be revived, is that pointed out by the 9th section of the Virginia statute, and in England by the 22nd section of the statute of Victoria. There must be a re-execution, or a duly executed codicil. There are no other means of showing an intention to revive. Destruction of the revoking instrument is not sufficient." Again: "It is obvious, however, that, inasmuch as the old doctrine of the re-publication of wills by parol acts or declarations, depends on the principle that the will so recognized becomes a new will of the date of the recognition, no such re-publication can take place, in respect of any will whatever, since the new statute came into operation, because no new will can be made, unless with the prescribed formalities."

The case of *Phaup et al. vs. Wooldridge et al.*, (14 *Grattan*, 332,) is one which arose, and has been determined by the court of appeals of Virginia, since the adoption of the new statute of that State. The facts of that case are briefly these: A paper was propounded for probate as the last will of Benjamin Phaup, by the executors nominated therein, and was opposed by two daughters of the decedent and their husbands. It was duly executed and attested in July, 1852. Afterwards, in July, 1854, Phaup, then seventy-four years old, married Mrs. Judith Bass. Prior to the marriage the parties entered into a marriage settlement, whereby it was agreed that all of her property should be settled upon her, with a general power of disposition on her part, and that she should have no claim on his estate if she survived him, except that she was to have an annuity of one hundred and fifty dollars out of his estate, but not so as to hinder a division thereof.

"The parol proofs were, that Phaup died in 1856, his wife surviving, there having been no issue of the marriage. That he expressed himself, from the time of his marriage up to the time of his death, much gratified that the marriage settlement would render it unnecessary to make his will again, and recognized the one offered for probate as his will and in full force. In his last illness he called for the paper and consulted one of the witnesses as to whether the property left to one of his daughters was effectually secured to her and her children, free from the control of her husband, telling the witness if that was not the case he wished the witness to fix it."

The Chesterfield county court, in which the paper was first offered, admitted it to probate. Upon an appeal from that court to the circuit court it was held by the latter, that though the paper had been duly executed and attested, and Phaup was competent to make a will, yet under the statute it was revoked by the marriage, and sentence was ¦pronounced against the will, and the sentence of the county court, by which the paper had been admitted to probate, was reversed.

Upon appeal the sentence of the circuit court was affirmed by the court of appeals. (14 *Grattan*, 337.) In the opinion of the court the question discussed chiefly was whether or not

there was a revocation; but it is plain that the additional question of re-execution was involved in the issue—which was will or no will—and was necessarily decided. For if the court had entertained the opinion that there had been such a re-execution of the will by the testator as the statute required, the sentence of the circuit court, by which the will had been rejected, could not have been affirmed.

We can see no stronger reasons for deciding in this case that there was a re-execution, than there was in the case of Phaup's will. Indeed, the facts in that case seem to us to be stronger in favor of a re-execution than in this.

The exposition of the 22d *section* of the statute of Victoria, given by *Williams*, in his work on *Executors*, (*vol.* 1, *p.* 177,) is similar precisely to that given by *Lomax* of the 9th *section* of the Virginia act. The Virginia author seems to have followed very closely, if he has not exactly copied, the English author.

These authorities show the interpretation given in England and Virginia to a statutory requirement, which corresponds in all material parts with that contained in the 11th *section* of our Statute of Wills, and tends to show that our conclusion in this case is the correct one.

The errors contained in the judgment of the circuit court are sufficiently apparent from the opinion above.

On account of said errors the judgment of the circuit court *is reversed*, and the cause remanded with directions to that court to *affirm* the judgment of the county court by which the writing, which was offered for probate as the last will of James G. Maxwell, deceased, was rejected.